U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

**MAY 2 2 2012**

**CLERK, U.S. DISTRICT COURT**

By_____
       Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

D.R. HORTON, INC., ET AL.,       §
                                 §
            Plaintiffs,           §
                                 §
VS.                              §   NO. 4:11-CV-039-A
                                 §
AMERICAN GUARANTEE & LIABILITY   §
INSURANCE COMPANY,               §
                                 §
            Defendant.           §

## MEMORANDUM OPINION
and
### ORDER

Before the court for decision is the motion of defendant, American Guarantee & Liability Insurance Company, for partial summary judgment as to the breach of contract cause of action alleged against defendant by plaintiffs, D.R. Horton, Inc., and D.R. Horton, Inc.–Denver (collectively, "Horton"). After having considered such motion, Horton's response thereto, defendant's reply, the summary judgment record, and pertinent authorities, the court has concluded that such motion should be granted.

### CONTENTS

I.    Nature of the Action . . . . . . . . . . . . . . . . . . 3

II.   The Grounds of Defendant's Motion  . . . . . . . . . . . 6

III.  Pertinent Parts of the Insurance Policies
      Issued by Admiral, National, and Defendant . . . . . . . 7

A.   Defendant's Policy . . . . . . . . . . . . . . . . . . 7

B.   National's Policy . . . . . . . . . . . . . . . . . . . 9

C.   Admiral's Policy . . . . . . . . . . . . . . . . . . 10

IV.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . 12

A.   Basic Legal Principles That Are
     Applicable to the Court's Decision . . . . . . . . 12

B.   This Case is Particularly Suited for
     Summary Disposition . . . . . . . . . . . . . . . . 13

C.   The Lack of Pleading or Probative Evidence
     That There Was "Property Damage" That Took
     Place During the July 1, 1999 to July 1, 2000
     Policy Year and Was Caused by an Occurrence . . . . 16

     1.   The Nature of the Claims Against
          Horton and the Settlement of Those
          Claims . . . . . . . . . . . . . . . . . . . . 16

          a.   The St. Andrews Lawsuit, and
               Its Settlement . . . . . . . . . . . . 16

          b.   The Sterling Commons Lawsuit,
               and Its Settlement . . . . . . . . . . 19

          c.   The Carlyle Park Lawsuit,
               and Its Settlement . . . . . . . . . . 24

     2.   Legal Principles That Bear on
          Whether There Is Probative Evidence
          That There Was Insured Property
          Damage During the July 1, 1999 to
          July 1, 2000 Policy Year . . . . . . . . . . 26

     3.   Horton Has Neither Pleaded Nor
          Offered Probative Evidence That
          Would Satisfy its Burden to
          Establish the Existence of Insured
          Property Damage During the July 1,
          1999 to July 1, 2000 Policy Year . . . . . . 32

|  | a. | Pleading Inadequacies as to Property Damage | 32 |
|  | b. | Absence of Probative Evidence | 33 |
|  |  | (1) The Morice Affidavit | 33 |
|  |  | (2) The Marvi Affidavit | 34 |
|  |  | (3) The Briggs Affidavit | 47 |
|  | 4. | Interim Conclusion | 49 |
| D. | | The Lack of Pleading or Probative Evidence That the Limits of the Underlying Policies Have Been Exhausted by Payment of Claims Covered by Those Policies During the July 1, 1999 to July 1, 2000 Policy Year | 50 |
|  | 1. | Applicable Legal Principles | 50 |
|  | 2. | Pleading Inadequacies as to Exhaustion | 53 |
|  | 3. | Absence of Probative Evidence | 56 |
|  | 4. | Interim Conclusion | 57 |
| E. | | Conclusion | 57 |
| V. Order | | | 58 |

I.

## Nature of the Action

This action originally was filed by Horton and other plaintiffs in the District Court of Tarrant County, Texas, 96th Judicial District. Defendant removed the action to this court. This court has subject matter jurisdiction based on complete diversity of citizenship of the parties and the amount in

3

controversy. Horton and related entities sought recovery under the liability insurance coverage provided by defendant to Horton by an insurance policy effective for the policy period of July 1, 1999, to July 1, 2000 ("defendant's policy"), for losses Horton and the other plaintiffs claimed they suffered by reason of claims made against them in state court lawsuits for recovery of damages resulting from construction defects in residential complexes that they constructed and sold at various places in California, Arizona, Nevada, and Colorado.

The pleading by which the action was initiated alleged that defendant has payment obligations to it under defendant's policy with respect to claims that were made against Horton and related entities in twenty-eight different liability lawsuits filed against Horton and the related entities in courts of those four states seeking recovery of damages based on claims by the plaintiffs in those lawsuits of construction defects existing in twenty-eight residential property complexes constructed and sold by Horton and the other entities. Pursuant to a stipulation of the parties, the claims of Horton and the other plaintiffs as to twenty-five of those lawsuits were dismissed with prejudice by a Final Judgment as to Certain Claims signed April 19, 2002, leaving at issue in this action whether defendant has a payment obligation to Horton under defendant's policy as to three of the

4

twenty-eight lawsuits, which are referred to as the "Carlyle Park Lawsuit," the "Sterling Commons Lawsuit," and the "St. Andrews Lawsuit," respectively.[1]

Defendant's policy is a second-level excess liability insurance policy, which provided certain liability insurance benefits to Horton once the policy limits of the insurance coverages of the primary general liability policy issued by Admiral Insurance Company ("Admiral") to Horton for the July 1, 1999 to July 1, 2000 policy year ("Admiral's policy") and the first-level excess general liability policy issued by National Union Fire Insurance Company of Pittsburgh, Pa. ("National") to Horton for the July 1, 1999 to July 1, 2000 policy year ("National's policy") have been exhausted by payment of losses covered by those policies.

Horton alleged three causes of action against defendant: first, breach of contract based on defendant's alleged unjustified denial of payment as to claims made against Horton in the state court lawsuits; second, penalties authorized by Texas statutes for failure to make prompt payment of insurance benefits allegedly owed by defendant to Horton; and, third, penalties

---

[1]On May 18, 2012, the court signed a Final Judgment as to Certain Parties so that the only plaintiffs remaining in the action would be the two who might claim insurance coverage from defendant related to the Carlyle Park, Sterling Commons, and St. Andrews Lawsuits.

pursuant to a Texas statute for defendant's alleged unfair method
of competition and unfair or deceptive acts.

## II.

### The Grounds of Defendant's Motion

The brief filed in support of defendant's motion states that
the issue to be decided on the motion is whether Horton "can
establish the essential element to their cause of action for
breach of contract: whether the American Guarantee Policy has
been <u>triggered</u>."  Mot., Br. at 1 (emphasis in original).
Arguments made by defendant in support of its motion disclose
that:

1.    Defendant contends that Horton has not adduced
probative evidence that Horton became legally obligated to pay
any amount by reason of legal liability imposed on Horton by law
because of property damage that took place during the July 1,
1999 to July 1, 2000 policy period and was caused by an
occurrence.

2.    Defendant contends that Horton has not adduced
probative evidence that the limits of the liability insurance
coverage provided by Admiral's policy and the limits of the
liability insurance coverage provided by National's policy have
been exhausted by payment on claims asserted against Horton for

losses that occurred during that July 1, 1999 to July 1, 2000 policy year that were insured by the coverages of those policies.

Defendant argues that, therefore, Horton has failed to carry its summary judgment burden to raise a genuine issue of fact as to essential elements of its breach of contract claims.[2]

III.

## Pertinent Parts of the Insurance Policies Issued by Admiral, National, and Defendant

A.   Defendant's Policy

The declarations page of defendant's policy discloses that: (1) the policy number is AEC 3597023 00; (2) the policy is a "Following Form Excess Liability Policy"; (3) the policy period is from July 1, 1999, to July 1, 2000; (4) the limits of insurance are $25,000,000 per occurrence and $25,000,000 aggregate; and (5) the "Controlling Underlying Policy" is National's policy (Policy Number BE 701-35-17), with a per-occurrence limit of insurance of $25,000,000 and an aggregate limit of insurance of $25,000,000.  Mot., Br., App. at 197.

The "Coverage" section, under the heading "Insuring Agreements," provides that defendant will pay on behalf of Horton the sums in excess of the $25,000,000 coverage provided by

---

[2]Defendant makes other arguments in support of its motion, but the court does not consider that it is required to discuss the other arguments in order to resolve defendant's motion in its favor.

National's policy that Horton becomes legally obligated to pay as damages, subject to limitations described in the "Limits of Insurance" section of defendant's policy, <u>id.</u> at 204, and that, except as otherwise provided in the policy, "the coverage follows the definitions, terms, conditions, limitations, and exclusions of [National's policy]," <u>id.</u>

Subject to other limitations of liability language, the policy provides that "if all Underlying Limits are exhausted," the "<u>insurance provided by [the] policy</u> . . . <u>will apply as underlying insurance subject to the same terms, conditions, definitions and exclusions of the Controlling Underlying Policy</u>, except for the terms, conditions, definitions and exclusions of this policy."[3]  <u>Id.</u> (emphasis added).

Under the heading "Conditions," and the subheading "Other Insurance," defendant's policy provides:

> If other insurance applies to damages that are also covered by this policy, this policy will apply excess of the other insurance. . . .

---

[3]Endorsement #4 to defendant's policy contains language that has potential applicability to this action, reading as follows:

> This policy does not apply to any liability, damage, loss, cost or expense arising out of:
> 1.   Any injury or damage which incepts prior to the effective date of this policy; or
> 2.   Any occurrence, loss, or claim of which the insured had knowledge or notice prior to the effective date of this policy; or . . . .

Mot., Br., App. at 212.  However, defendant has not relied on this policy language, and the fact of the matter is that the probative summary judgment evidence does not establish the point in time when any injury or damage incepted or when the insured had knowledge or notice of any occurrence, loss, or claim. Therefore, the court has not taken the language of Endorsement #4 into account in its decision.

> Other insurance includes any type of self-insurance or
> other mechanism by which an insured arranges for
> funding of legal liabilities.

Id. at 208.

B.   National's Policy

The declarations page of National's policy discloses that:
(1) the policy number is BE 701-35-17; (2) the policy period is
from July 1, 1999, to July 1, 2000; and (3) the limits of
insurance are $25,000,000 per occurrence and $25,000,000
aggregate.   Mot., Br., App. at 54.

The "Coverage" section, under the heading "Insuring
Agreements," provides that:

> We will pay on behalf of the Insured those sums . . .
> that the Insured becomes legally obligated to pay by
> reason of liability imposed by law . . . because of
> . . . Property Damage, . . . that takes place during
> the Policy Period and is caused by an Occurrence
> happening anywhere in the world. . . .

Id. at 55 (emphasis added).

The word "Occurrence" is defined to mean:

> As respects . . . Property Damage, an accident,
> including continuous or repeated exposure to
> conditions, which results in . . . Property Damage
> neither expected nor intended from the standpoint
> of the Insured.  All such exposure to
> substantially the same general conditions shall be
> considered as arising out of one Occurrence;

Id. at 59.   And, the term "Property Damage" is defined to mean:

1.   Physical injury to tangible property, including
     all resulting loss of use of that property.  All

> such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> 2.   Loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the Occurrence that caused it.

Id. at 60.

The insurance provided by National's policy is excess over the insurance provided by Admiral's policy, i.e., the limits of liability provided by Admiral's policy must be exhausted before National has a payment obligation under National's policy.  Id. at 56, 68.

C.   Admiral's Policy

The declaration pages of Admiral's policies disclose that: (1) the policy number is A99AG06800; (2) the policy period is from July 1, 1999, to July 1, 2000; and (3) the limits of insurance are $1,000,000 per occurrence and $2,000,000 aggregate. Mot., Br., App. at 5-6.[4]  There is a "Self Insured Retention Endorsement," Endorsement No. 17, that establishes a $200,000 per occurrence and $2,500,000 aggregate self-insured retention, saying that Admiral's "total liability for all damages will not exceed the limits of liability stated in the Declarations and

---

[4]There are amendments, by way of Endorsement Nos. 15 and 16, that suggest that the aggregate limit of Admiral's policy applies separately to each of Horton's projects. Mot., Br. App. at 40-41. However, the court does not need to concern itself with those amendments.

will apply in excess of the insured's self-insured retention (the 'Retained Limit')." Id. at 42, 44.  "'Retained Limit' is the amount . . . which [Horton is] obligated to pay, and only includes damages otherwise payable under [Admiral's policy]." Id. at 42.

Though structured differently, the property damage insuring agreement in Admiral's policy is basically the same as the property damage insuring agreement in National's policy.  Admiral agrees to pay "those sums that [Horton] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." Id. at 8.  The policy goes on to say that "[t]his insurance applies to . . . 'property damage' only if: (1) . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) . . . 'property damage' occurs during the policy period." Id.

The policy defines the word "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 19. The term "property damage" is defined to mean:

   a.   Physical injury to tangible property, including
        all resulting loss of use of that property.  All
        such loss of use shall be deemed to occur at the
        time of the physical injury that caused it; or

   b.   Loss of use of tangible property that is not
        physically injured.  All such loss of use shall be

11

> deemed to occur at the time of the "occurrence"
> that caused it.

Id. at 20.

## IV.

### Analysis

A.  Basic Legal Principles That Are Applicable to the
    Court's Decision

The parties appear to be in agreement that the substantive

law applicable to this case is Texas law.[5]  Texas law places the

burden of pleading and proving the existence of insurance

coverage under an insurance policy on the party claiming it.

Guaranty Nat'l Ins. Co. v. Bic Mfg. Co., 143 F.3d 192, 193 (5th

Cir. 1998); Employers Cas. Co. v. Block, 744 S.W.2d 940, 944

(Tex. 1988) (holding that "[a]n insured cannot recover under an

insurance policy unless facts are pleaded and proved showing that

damages are covered by his policy.").  See also Wallace v. United

Servs. Auto. Ass'n, 2 S.W.3d 300, 303 (Tex. App.--San Antonio

1999, pet. denied).

Texas courts "construe insurance policies according to the

same rules of construction that apply to contracts generally" and

"[i]f an insurance contract uses unambiguous language, [Texas

---

[5]Defendant states in its brief that "[t]he parties do not dispute that Texas law applies to [defendant's] Policy." Mot., Br. at 10. Horton does not take issue with that statement. Rather, Horton repeatedly relies in its brief on Texas law. Horton's Br. at 9, 12, 14. Moreover, Horton relies on Texas statutes as providing the bases for two of its three causes of action.

courts] must enforce it as written." <u>Don's Bldg. Supply, Inc. v.</u>
<u>OneBeacon Ins. Co.</u>, 267 S.W.3d 20, 23 (Tex. 2008). "Policy terms
are given their ordinary and commonly understood meaning unless
the policy itself shows the parties intended a different,
technical meaning." <u>Id.</u>  See also <u>Lennar Corp. v. Great Am. Ins.</u>
<u>Co.</u>, 200 S.W.3d 651, 680 (Tex. App.--Houston [14th Dist.] 2006,
pet. denied), <u>abrogated on other grounds by</u> <u>Gilbert Tex. Constr.,</u>
<u>L.P. v. Underwriters at Lloyd's London</u>, 327 S.W.3d 118 (Tex.
2010).

B.   <u>This Case is Particularly Suited for Summary</u>
     <u>Disposition</u>

     This action is particularly suited for summary disposition
under the rules and standards expressed by the Supreme Court in
<u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475
U.S. 574 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986);
and, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  There
is no genuine dispute as to any material fact, and defendant is
entitled on the existing record to judgment as a matter of law as
to the contract claims.

     The party moving for a summary judgment may discharge its
burden of showing that there is no genuine issue of material fact
by pointing out the absence of evidence to support one or more of
the essential elements of the non-moving party's claim "since the

13

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 323-25. Once the moving party has carried its burden under Rule 56, the nonmoving party must do more than merely show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 586. The party opposing the motion may not rest on mere allegations or pleaded denials, but must set forth specific facts showing a genuine issue for trial. Anderson, 477 U.S. at 248, 256. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994). Conclusory allegations are insufficient to defeat a motion for summary judgment. Simmons v. Lyons, 746 F.2d 265, 269 (5th Cir. 1984). An issue is material only if its resolution could affect the outcome of the action. Anderson, 477 U.S. at 248.

Here, Horton has had ample opportunity to come forward with probative evidence that would support each element of its contract claim, but has failed to do so. Horton has put into the summary judgment record voluminous documents, and two lengthy affidavits, that provide a large amount of information relative to the claims made in the Carlyle Park, Sterling Commons, and St.

14

Andrews Lawsuits, and the settlements of those claims; but conspicuously absent from the material adduced by Horton is any probative evidence that would raise an issue of fact as to two important elements of Horton's breach of insurance contract claim against defendant--that the claims against Horton in those lawsuits caused Horton to be legally obligated to pay amounts by reason of legal liability imposed on Horton by law because of property damage that took place during the policy period and was caused by an occurrence, and that defendant's policy payment obligation otherwise would have been invoked by exhaustion of the limits of liability insurance coverage provided by Admiral's policy and National's policy on claims covered by those policies.

Were this case not to be resolved summarily under the authority of Rule 56, tremendous litigant and judicial resources would unnecessarily be devoted to its resolution.  Thus, the wholesome utility of the summary judgment rule is realized by a summary disposition of this action.

15

C.   <u>The Lack of Pleading or Probative Evidence That There
     Was "Property Damage" That Took Place During the July
     1, 1999 to July 1, 2000 Policy Year and Was Caused by
     an Occurrence</u>

   1.   <u>The Nature of the Claims Against Horton and
        the Settlement of Those Claims</u>

        a.   <u>The St. Andrews Lawsuit, and Its Settlement</u>

The St. Andrews Lawsuit was brought by the St. Andrews at

Plum Creek Condominium Association in the District Court of

Douglas County, Colorado, against certain Horton entities in

November 2004 complaining of the construction of eighty-six

condominium units, in thirty-three buildings, in the St. Andrews

Community.   Pls.' Resp., App. at 314-15.   The eighty-six units

were alleged to have been completed in approximately June 2001.

<u>Id.</u> at 315.   Certain of the Horton entities were the builder-

vendors of, developers of, and general contractors for the

project.   <u>Id.</u>   The pleading alleges that "[v]arious elements of

the Units and Common Elements suffer from . . . construction

defects or deficiencies . . . which have caused, and will

continue to cause, resultant and consequential property and other

damages," <u>id.</u> at 324, listing as specific areas of defects or

deficiencies, "Hardboard Siding & Trim," "Brick Veneer Facade,"

"Roofing and Gutter Systems," "Civil (Asphalt and Concrete),"

"Grading/Drainage," "Structural/Foundation," and

"Crawlspaces/Structural Floors."   <u>Id.</u> at 324-27.

Eight claims for relief against Horton entities are alleged in the pleading, the first requesting declaratory relief relative to the constitutionality of certain Colorado statutory provisions, the second seeking recovery based on negligence resulting in property damage, the third seeking recovery based on negligent repair resulting in property damage, the fourth seeking recovery based on breach of implied warranty resulting in property damage, the fifth seeking recovery based on misrepresentation/nondisclosure resulting in property damage, the sixth seeking recovery based on Colorado Consumer Protection Act violations resulting in property damage, the seventh seeking recovery of damages based on negligence in the form of violations of the CCIOA (apparently referring to uniform building code provisions), and the eighth seeking damages based on breach of fiduciary duty.

The prayers for relief, in addition to seeking a declaratory adjudication, requested the following relief:

> 2.   For the Association's actual damages, costs of suit, fees of experts, including engineering and construction experts, attorney fees, interest as permitted by law from the date of occurrence to the date of entry of judgment, as well as post-judgment interest until paid;

> 3.   For the cost of repairing the Project to a reasonably good condition, and to a better condition, if that is what was promised or represented by Defendants;

17

4.   For the cost of the replacement of any
defective construction elements, as well as the repair
of those portions of the Project for which the
Association has the legal responsibility to repair, and
which were damaged by these defective construction
elements;

. . . .

7.   For loss of the use of the Project, as well
as for all annoyance, discomfort, inconvenience, and
aggravation arising from the injury to the Project and
any required investigation and repair efforts;

8.   For specific performance of the promises made
by Defendants that remain unfulfilled, and for specific
performance of the representations made by Defendants
that were false; or, alternatively, for specific
restitution and payment to the Association in the
amount necessary for the Association to fund the cost
of fulfilling such promises and/or effecting such
representations.

9.   For treble damages, costs and attorney fees
pursuant to C.R.S. § 6-1-113 (as against those
Defendants against whom such claims have been made),
and for attorney fees and costs as provided for by any
applicable statute, law or contract; and,

Id. at 342-43.

Apparently the claims against Horton in the St. Andrews

Lawsuit were settled in February 2007 by an unusual settlement

arrangement that involved the execution and delivery by the St.

Andrews condominium association of six different settlement

agreements and releases, all executed at the same time and date,

one showing a $137,894.57 payment in settlement of the fiduciary

duty and CCIOA claims, another showing a $137,894.57 payment in

18

settlement of the breach of implied warranty claims, another
showing a $690,161.84 payment in settlement of the
misrepresentation claims, another showing a $5,880,084.00 payment
in settlement of the negligence (including negligent supervision)
claims, another showing a $589,821.15 payment in settlement of
the negligent repair claims, and a final one showing a $14,133.87
payment in settlement of the punitive damage claims.  Id. at 334-
441.

      b.   The Sterling Commons Lawsuit, and Its
           Settlement

The Sterling Commons Lawsuit complaint shows that it was
filed in November 2003 in the District Court of Arapahoe County,
Colorado, by the Sterling Commons II Condominium Association
against certain of the Horton entities.  Pls.' Resp., App. at
442-57.  The allegations for recovery of damages are essentially
the same as those that were made in the pleading by which the St.
Andrews Lawsuit was instituted.  The condominium association
alleged that the units in the condominium project, which was
constructed by certain of the Horton entities, were fraught with
construction defects that required reconstruction and repair of
the units and common areas in the project.  Under the heading

"General Allegations," the plaintiff summed up the nature of the claims against the Horton entities as follows:

> 14.   Commencing at a date currently unknown to Association, the Defendants participated in the development, advertising, marketing, construction and sale of individual units and common and limited common areas at Sterling Commons II.  Association brings this action in its own name and on behalf of Homeowners for the defects in common areas and individual units at Sterling Commons II.  Each of the Defendants, is a Declarant as defined by § 38-33.3-103, C.R.S. (2001).

> . . . .

> 18.   Association has received complaints regarding construction deficiencies and resulting damage, including but not limited to: Balconies, grading and drainage, crawl space water intrusion, crawl space ventilation, stairs and siding.  Said construction deficiencies appear to be project wide.

> 19.   By inadequately constructing the property, Defendants breached duties owed to Association and are liable for damages in an amount to be proven at trial.

> 20.   Defendants owed a duty arising independent of any contract to Association and its members to properly construct Sterling Commons II in accordance with applicable building codes, ordinances and industry standards.

> 21.   Defendants as Declarants and/or Individuals, as Members of the Board of Directors of Association, owed a fiduciary duty to Association, imposed by the Colorado Common Interest Ownership Act and the Association's Declaration, to maintain and enhance the value of Sterling Commons II and as such breached this duty by constructing a community riddled with construction deficiencies and failing to invest Association with sufficient resources to maintain habitability of the premises.

　　　　22.　The Defendants, were affiliates of each
other, pursuant to § 38-33.3-103(1) C.R.S. (2000).

　　　　23.　Association alleges that Defendants, and each
of them, conspired and pursued a common plan or design
to negligently construct various aspects of the Common
Interest Community, acting in concert with any and all
entities involved with the planning and construction of
the Common Interest Community, including, but not
limited to, contractors, subcontractors, material men,
suppliers of goods and manufacturers. Defendants, and
each of them, are jointly liable for the damages
incurred pursuant to § 13-21-111.5(4), C.R.S. (2000).

Id. at 444-46.

The eight claims for relief alleged in the pleading were

negligence, negligence per se, breach of implied warranty, breach

of contract, fraudulent concealment, breach of fiduciary duty,

negligent misrepresentation, and deceptive trade practices. Id.

at 447-56. As to each of the claims for relief, the plaintiff

prayed for "damages in an amount to be proven at trial," plus

"all costs, expenses, and attorney fees incurred by Plaintiff as

allowed by any applicable statutes or contracts," and "[t]hree

times the amount of actual damages, plus costs and attorney fees,

pursuant to [a Colorado statute]." Id. at 456.

Apparently the claims in the Sterling Commons Lawsuit were

settled in June 2007, as evidenced by a document titled

"Settlement Agreement and Full and Final Release." Id. at 458-

68. The settlement document recites that it is in full

settlement of all claims asserted or that could have been

asserted by the Sterling Commons condominium association against the Horton entities who were named as defendants in exchange for payment of, or a promise to pay, $7,250,000, plus funds in the amount of $195,000 collected from third-party defendants.  Id. at 458.

A document titled "Allocation Document" attached to the settlement agreement as Exhibit A has a breakdown by cause of action of the total $7,445,000 settlement amount, showing that $4,505,460 was allocated to the negligence and negligence per se causes of action, $25,000 was allocated to the breach of warranty cause of action, $10,000 was allocated to the breach of contract cause of action, $5,000 was allocated to the fraudulent concealment cause of action, $10,000 was allocated to the fiduciary duty cause of action, $125,000 was allocated to the deceptive trade practices and negligent misrepresentation cause of action, $400,000 was allocated to plaintiff's litigation costs, and $2,211,540 was allocated to interest.  Id. at 470. The Allocation Document also showed that the $4,505,460 amount allocated to the negligence and negligence per se causes of action was the total of cost of repair items, and the document

22

provided a breakdown by description of the repair work and the

dollar amount of repair costs allocated to each as follows:

| Description | Amount |
|---|---|
| Deck waterproof membrane failure; soffits with water intrusion, stains and deterioration | $430,858.02 |
| Guardrail and handrail caps are improper wood species; non-decay resistant | $135,097.51 |
| Painting of Exterior | $194,185.34 |
| Brick Veneer without weather barrier | $97,380.60 |
| Exterior Gypsum board is improperly fastened for 1-hour fire-resistive rating | $7,875.82 |
| Exterior entry door thresholds with excessive height; greater than ¾" at ground floor and 1" at upper floors at entry door at all levels | $4,636.77 |
| Vinyl windows; installation, flashing deficiencies, unsealed frame corners missing building paper, damaged nail fins, frame joints with gaps, discontinuous frames at mullions and unsealed areas of mulled windows | $266,186.73 |
| Ground floor | $764,668.15 |
| Elevated balconies and landing repairs | $564,806.65 |
| Mold remediation (Allowance at 36 units - decks & exterior walls) | $223,060.97 |
| Structural repairs to the offset steel interior columns | $72,774.89 |

| | |
|---|---|
| Extend interior piers six inches above the soils | $59,834.32 |
| Re-establish perimeter grade wall void | $12,610.69 |
| Epoxy injection of foundation cracks | $1,440.37 |
| Remove existing vapor barrier and debris. Install new vapor barrier. | $235,357.43 |
| Mold remediation | $291,841.79 |
| Remove existing and install new perimeter drain | $234,487.24 |
| Provide ductwork and mechanical ventilation system | $72,487.67 |
| Provide crawlspace vents at corner units | $20,840.56 |
| Roofing and gutter systems | $155,362.21 |
| Type A unit repairs | $72,272.97 |
| Repairs recommended in the 1/9/07 report | $194,604.80 |
| Grading, irrigation & drainage | $288,048.21 |
| Cosmetic repairs misc. (allowance) | $104,740.28 |

TOTAL Cost of Repair: $4,505,460.00

Id. at 470-71.

c.    The Carlyle Park Lawsuit, and Its Settlement

The Carlyle Park Lawsuit complaint shows that it was filed
in April of 2003 in the District Court of Arapahoe County,
Colorado, by Carlyle Park Homeowners Association, Inc., against

24

certain of the Horton entities.   Pls.' Resp., App. at 473-88.   It complains of construction defects in homes constructed and sold by Horton entities in the Common Interest Community of Colorado Park, which includes 213 homes and common areas.   Id. at 473-74. The complaint by which the suit was filed is virtually identical to the complaint by which the Sterling Commons Lawsuit was filed. The same attorneys filed both suits.   Summed up, the allegations of the pleading in the Carlyle Park Lawsuit are that certain Horton entities constructed and sold homes with construction deficiencies, thereby breaching duties owed to the plaintiff. The eight claims for relief alleged in the Carlyle Park Lawsuit are identical to those mentioned above that were alleged in the Sterling Commons Lawsuit; and, the prayers for relief in the two lawsuits appear to be identical.

The claims in the Carlyle Park Lawsuit appear to have been settled in July 2007, as evidenced by a document titled "Settlement Agreement and Full and Final Release."   Id. at 489-98.   The settlement was of all claims that were, or could have been, asserted in the Carlyle Park lawsuit.   According to the settlement document, a total of $19,500,000 was paid, or promised to be paid, "in full and final settlement of all claims asserted or that could have been asserted between the Association and All Defendants in the Lawsuit."   Id. at 489.

25

An "Allocation of Plaintiff Settlement" exhibit was attached
to the settlement agreement.  Its breakdown by cause of action
showed $17,278,007 allocated to the negligence and negligence per
se claims, $97,500 allocated to the breach of implied warranty
claim, $97,500 allocated to the breach of contract claim, $97,500
allocated to the deceptive trade practices, negligent
misrepresentations, and fraudulent concealment claims, $97,500
allocated to the breach of fiduciary duty claim, $168,000
allocated to HOA prior repairs, $69,843 allocated to HOA
litigation costs, and $1,594,150 allocated to interest.  The
Allocation of Plaintiff Settlement document gave an itemization
of the things included in the $17,278,007 allocation to the
negligence claim that is identified in the document as "Total
Cost of Repair."  Id. at 500-05.  The appearance is that
virtually all of the $17,278,007 represented the re-doing of
construction work that allegedly was not properly done in the
initial construction of the project.

2.    Legal Principles That Bear on Whether There Is
      Probative Evidence That There Was Insured Property
      Damage During the July 1, 1999 to July 1, 2000
      Policy Year

Texas appears to be firmly committed to the proposition that
a liability insurance policy can cover claims made against a home
builder arising out of defective work if the defective work, in

26

turn, caused physical damage to parts of the home's structure.

In <u>Grimes Construction, Inc. v. Great American Lloyds Insurance</u>
<u>Co.</u>, the Supreme Court summarized its earlier holding in <u>Lamar</u>
<u>Homes, Inc. v. Mid-Continent Casualty Co.</u>, 242 S.W.3d 1 (Tex.
2007), as follows:

> The CGL's insuring agreement provides coverage for
> "property damage" caused by an "occurrence." Property
> damage is defined as "physical injury to tangible
> property," and an occurrence is defined as an
> "accident, including continuous or repeated exposure to
> substantially the same general harmful conditions."
> <u>Id.</u> at 6. In Lamar Homes, we were asked whether an
> insurer under a CGL policy had a duty to defend its
> insured, a homebuilder, against allegations that the
> builder's defective workmanship caused physical damage
> to parts of the home. <u>Id.</u> at 4. We concluded that
> allegations of unintended construction defects might
> constitute an "accident" or "occurrence" under the CGL
> policy and that allegations of damage to or loss of use
> of the home itself might also constitute "property
> damage" sufficient to trigger the duty to defend under
> the policy. <u>Id.</u>

248 S.W.3d 171, 171-72 (Tex. 2008). Not only do allegations of
the kind described in the quoted language trigger a duty to
defend, proof of the alleged facts would lead to a duty to pay if
the damage happened during the effective period of the insurance
policy (and, assuming, as appears to be the case in the instant
action, there are no policy exclusions that would change the
outcome).

The next issue that presents itself here is what set of
circumstances defines the point in time when the "property

27

damage" took place.  That question has been definitively answered by Texas court decisions.  Texas has adopted the "actual injury" or "injury-in-fact approach" in determining when insurance coverage is triggered as to a property damage claim under liability insurance policies similar to those with which the court is dealing in the instant action.  <u>Don's Bldg. Supply, Inc.</u>, 267 S.W.3d at 25.  By way of explanation, the Supreme Court said in <u>Don's Building Supply</u> that "[t]he policy in straightforward wording provides coverage if the property damage 'occurs during the policy period,' and further provides that property damage means '[p]hysical injury to tangible property.'" <u>Id.</u> at 29.  And:

> Pinpointing the moment of injury retrospectively is sometimes difficult, but we cannot exalt ease of proof or administrative convenience over faithfulness to the policy language; our confined task is to review the contract, not revise it.  Our prevailing concern is not one of policy but of law, and we must honor the parties' chosen language-covering third-party claims if damage to the claimant's property occurred during the policy period.  The policy asks when damage happened, not whether it was manifest, patent, visible, apparent, obvious, perceptible, discovered, discoverable, capable of detection, or anything similar.  Occurred means when *damage* occurred, not when *discovery* occurred.  In this case, property damage occurred when the home in question suffered wood rot or some other form of physical damage.
>
> Looking to the date of actual injury, besides being consistent with the policy terms, is also consistent with scholarly authority.  To quote one leading insurance law treatise, "<u>the time of the</u>

> occurrence of the accident within an indemnity policy
> is generally not considered to be the time the wrongful
> act was committed but the time when the complaining
> party was actually damaged."

Id. at 29-30 (quoting 7A John Alan Appleman, Insurance Law and
Practice § 4491.01 (Walter F. Berdal ed., 1979)) (underlining
added).

When discussing the policy language there at issue, which is
essentially the same policy language with which the court is
concerned in the instant action, the Supreme Court made the
following holding in Don's Building Supply:

> Considering these [policy] provisions together and
> reading them for their plain meaning, we hold that
> property damage under this policy occurred when actual
> physical damage to the property occurred.  The policy
> says as much, defining property damage as "[p]hysical
> injury to tangible property," and explicitly stating
> that coverage is available if and only if "'property
> damage' occurs during the policy period."  So in this
> case, property damage occurred when a home that is the
> subject of an underlying suit suffered wood rot or
> other physical damage.

Id. at 24.

In Pine Oak Builders, Inc. v. Great American Lloyds
Insurance Co., the Supreme Court explained Don's Building Supply,
saying, "[w]e adopted . . . the actual-injury rule, under which
property damage occurs during the policy period if 'actual
physical damage to the property occurred' during the policy
period."  279 S.W.3d 650, 653 (Tex. 2009) (footnote omitted).

The Texas Court of Appeals in <u>Lennar Corp.</u> made clear that
the creation or existence of construction defects, and the cost
of repairing those defects, does not constitute property damage
within the meaning of insurance policies of the kind at issue.
<u>Lennar Corp.</u>, 200 S.W.3d at 673-81.  In <u>Lennar Corp.</u>, the court
explained that "although defective construction may constitute an
'occurrence,' the insurer indemnifies the insured only for
resulting 'property damage' arising after the project is
completed."  <u>Id.</u> at 673-74.  The court put emphasis on the
definition of "property damage" as "'[p]hysical injury to
tangible property, including all resulting loss of use of that
property.'"  <u>Id.</u> at 677.  The <u>Lennar Corp.</u> court held that in a
construction defect case, the cost to repair damage to property
caused by construction defects is covered by the insurance
policy, but not costs to do the repairs or replacements necessary
to remedy the construction defects themselves.  <u>Id.</u> at 677-80,
681.  The defective work does not itself constitute property
damage.  <u>Id.</u> at 79.  Nor does the cost of preventive work, i.e.,
the cost of repairs or replacements to prevent future property
damage, constitute insured property damage.  <u>Id.</u>  Also outside
the scope of the "property damage" coverage are incidental costs,
such as overhead costs, personnel costs, attorneys' fees, etc.
<u>Id.</u> at 680-81.

In order to prevail on an insured property damage claim, the insured must distinguish, and apportion, the insured property damage costs from the non-insured costs, such as repairs or replacements necessary to remedy the construction defects themselves, incidental costs, and the cost of repairs or replacements to prevent future property damage. Id. at 679-80, 681 ("Lennar must apportion its damages between covered damages and non-covered damages."). This principle is consistent with the rule recognized in Texas that the insured's burden to prove the existence of insurance coverage includes the presentation of evidence upon which the fact finder can allocate between the damage attributable to non-covered perils and damage from a covered peril. Wallis v. United Servs. Auto. Ass'n, 2 S.W.3d 300, 302-03 (Tex. App.--San Antonio, pet. denied (1999)) (holding that "[b]ecause an insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof."). A take-nothing judgment is proper if the insured fails to carry its apportionment burden. Id. at 304.

3. <u>Horton Has Neither Pleaded Nor Offered Probative
Evidence That Would Satisfy its Burden to
Establish the Existence of Insured Property Damage
During the July 1, 1999 to July 1, 2000 Policy
Year</u>

a.   <u>Pleading Inadequacies as to Property Damage</u>

Horton's complaint, which was filed in state court on
December 14, 2010, could not have survived a motion to dismiss
for failure to state a claim upon which relief could be granted.
Pls.' Original Pet. (Docket Entry 8).  Horton made the broad
allegation that it "tendered a number of claims for which
coverage is afforded under the Policy," and those claims include,
but are not limited to, the twenty-eight state court lawsuits
listed in the pleading.  <u>Id.</u> at 5-7.  After the listing of the
lawsuits, Horton creates the term of art "Covered Claims" it uses
in its pleading, which is defined as nothing more than "[a]ll of
the covered claims tendered by [] Horton."  <u>Id.</u> at 7.
Interestingly, Horton jumps in its pleading to the "Covered
Claims" term of art without alleging any facts that would support
a conclusion that any of the claims tendered by Horton to
defendant are property damage claims insured by defendant's
policy.

Under the "Breach of Contract" cause of action heading,
Horton starts out with the general allegation that "[u]nder the
Policy, American Guarantee is obligated to reimburse [] Horton

32

for amounts incurred as a result of the Covered Claims." Id. at
7, ¶ 29. No specificity is alleged. There is no allegation that
any of the defective work about which complaint was made in the
twenty-eight lawsuits in turn caused physical damage to any of
the residential structures that were included in the projects
that were the subject matter of the lawsuits. Much less is there
any allegation that any insured property damage took place during
the July 1, 1999 to July 1, 2000 policy year.

The conclusory allegations of Horton's complaint fail to
satisfy the pleading standards articulated by the Supreme Court
in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic
Corp. v. Twombly, 550 U.S. 544 (2007).

> b. Absence of Probative Evidence

Horton's summary judgment presentation is equally lacking
from an evidentiary standpoint. Horton tendered as summary
judgment evidence of property damage three affidavits, with
voluminous attachments to two of them.

> (1) The Morice Affidavit

The first affidavit is of David T. Morice ("Morice"), who
identified himself as vice president and legal counsel for
Horton. Pls.' Resp., App. at 304-13. Attached to that affidavit
are the complaints by which the St. Andrews, Sterling Commons,
and Carlyle Park Lawsuits were instituted, and the documents used

for the settlement of the claims against Horton in those lawsuits.  _Id._ at 314-505.  As previously noted, the allegations in those lawsuits establish without any doubt that the principal, if not the only real, complaints in the lawsuits were about Horton's defective work, and that the principle relief sought in the lawsuits was in the form of damages related to the cost of correcting those construction defects or preventing future problems caused by the defects.  Though having unusual wording, the documents by which the claims against Horton in those lawsuits were settled make equally clear that the monies paid in settlement were primarily, if not solely, for uninsured damages, in the form of costs to remedy construction defects and for corrective work to prevent future damage.  _See, e.g._, _id._ at 470-71, 500-05.

(2)   The Marvi Affidavit

The second affidavit is of Ali K. Marvi ("Marvi"), who identified himself as a professional engineer who was retained by Horton and its attorneys

> in this coverage lawsuit to serve as an expert witness and provide a report, and testimony if needed, on the following issues:
>
> • With respect to the underlying _Carlyle Park, St. Andrews_, and _Sterling Commons II_ matters, which construction defects involved actual physical injury to tangible property, and which units, buildings, common areas, or

34

other portions of the project were affected
by such defects; and

- With respect to those construction defects
that involved actual physical injury to
tangible property, what portion of that
damage occurred, either in whole or in part,
from July 1, 1999 to July 1, 2000, which is
the period of coverage afforded under the
second level excess policy issued by
Defendant American Guarantee & Liability
Insurance Company ("AGLIC") to D.R. Horton,
Inc. and D.R. Horton-related entities
(sometimes herein referred to as the "AGLIC
Policy Period").

Id. at 3-4, ¶ 5.

A careful review of Marvi's affidavit, and the items
attached to it, discloses that the true goal of the work he did
for Horton related to this litigation must have been to convert
on paper what so obviously at the time of the institution and
settlement of the St. Andrews, Sterling Commons, and Carlyle Park
Lawsuits were claims for recovery of damages in the form of costs
to do the repairs and replacements necessary to remedy
construction defects into claims for insured property damage in
the form of costs to repair damage to the property caused by the
construction defects.

That this is so becomes apparent by the rewording by Marvi
in his work of the list of costs that Marvi says in his affidavit
"is a summary of the defects noted in our review to date and the
actual physical injury resulting from each defect." Id. at 5,

35

¶ 9.   The headings Marvi puts in his affidavit, and the descriptions and dollar amounts under those headings, are set forth below in their entirety:

| DEFECT | ACTUAL PHYSICAL INJURY | ESTIMATED REPAIR COSTS PER EXHIBIT 3 |
|---|---|---|
| Water contacting I-beam and associated trim. | The steel beams supporting the deck framing were exposed to moisture and experienced oxidation. | $140,220.00 |
| Untreated wood/concrete contact at exterior walls | Damage due to moisture wicking through the wall sheathing. | $703,533.00 |
| Uncovered siding and trim end joints. | Damage of un-painted or improperly painted exterior trim due to exposure to moisture. | $281,147.00 |
| Exterior trim embedded in concrete. | Damage due to moisture wicking from the concrete | $80,952.00 |
| Water leaks at the interior of the windows, windows and exterior trim. | Moisture penetration into the wall cavities causing deterioration of the framing, finishes, and insulation. | $1,564,193.00 |
| Missing sealant at exterior dissimilar materials, missing sealant at utility penetrations. | Moisture penetration into the wall cavities resulting in damage to the building elements, such as the insulation and drywall. | $56.842.00 |
| Improper installation and/or lack of flashing at artificial stone veneer. | Moisture penetration into the wall cavities resulting in damage to the untreated framing elements and finishing material. | $341,425.00 |
| Improper installation of roof shingles, shingle fasteners, flashing, and felt underlayment. | Moisture penetration into the structure resulting in damage to the roof framing, insulation and finishes. | $69,433.00 |

| DEFECT | ACTUAL PHYSICAL INJURY | ESTIMATED REPAIR COSTS PER EXHIBIT 3 |
|---|---|---|
| Improper eave construction including notched fascia boards, improper roof sheathing construction, and flashing. | Moisture penetration into the structure which caused damage to the fascias and soffits. | $461,476.00 |
| Improper installation of the skylights including flashing, skylight curb framing, and roof shingles at skylights. | Moisture penetration into the structure which caused damage to the roof framing, insulation and finishes. | $13,492.00 |
| Improper installation of roof vents. | Moisture penetration into the structure resulting in damage to the roof framing, insulation and finishes. | $30,822.00 |
| Improper installation of head wall flashing. | Moisture penetration into the structure resulting in damage to the headwall framing, roof framing, insulation and finishes. | $15,661.00 |
| Local and global drainage defects throughout the site. | Deterioration due to excessive moisture wicked from the soil into the siding and trim surrounding the building. | $571,366.00 |
| Improper flatwork concrete specification and poor workmanship. | Scaling of exterior flatwork, including sidewalks and driveways. | $220,960.00 |
| Improperly constructed HVAC platforms. | Excessive deflection of platforms and failure of platform framing connections. | $50,346.00 |
| Squeaking floors at the second floor. | Damage to the floor system due to failure of the connection between the floor trusses and the floor sheathing. | $8,104.00 |
| 2nd floor trusses sagging. | Damaged floor trusses and excessive floor truss deflection. | $222,563.00 |
| Damaged roof trusses. | Damaged roof trusses including broken truss chords. | $9,152.00 |

| DEFECT | ACTUAL PHYSICAL INJURY | ESTIMATED REPAIR COSTS PER EXHIBIT 3 |
|---|---|---|
| Improper construction of second floor cantilevers at rear of buildings. | Damage to framing due to elimination of support brackets. | $328,612.00 |
| Improper construction of front entry covers. | Damage due to a lack of structural support brackets. | $331,682.00 |
| Improperly supported deck cover column. | Damaged floor sheathing due to excessive deflection. | $196,108.00 |
| Cut floor trusses webs and chords. | Damage to floor trusses and girder trusses. | $5,174,500.00 |

Pls.' Resp., App. 5-6.

When the reader turns to the cost-of-repair breakdown contained in the Carlyle Park Lawsuit settlement documents that are a part of the Morice affidavit, the reader will find striking Marvi's rewording of the listed items to cause them to be converted on paper from cost of repair and replacement of construction defects into cost to repair property damage caused by those construction defects.  The very same items, with different labels but with exactly the same dollar amounts, had been described in the settlement documents as follows:

**B.**    <u>Breakdown of Cost of Repair:</u>

| Descriptions | Palace Cost of Repair |
|---|---|
| ... | |

| Descriptions | Palace Cost of Repair |
|---|---|
| Water contacting I-beam and trim: decks over garages need weather protection on beams; expose top of beams by removing deck and install new sheet metal flashing | $140,220.00 |
| Untreated wood in contact with concrete: at entries where exterior walls bear onto extended slabs, water wicks from slab onto wall; install waterproofing | $703,533.00 |
| Uncovered siding end joints, siding issues, project trim | $281,147.00 |
| . . . | |
| Exterior trim embedded in concrete: at exterior concrete rear sliding glass door stops; R/R stoops w/ 1" clearance from exterior trim; concrete 65%, GC 35% | $80,952.00 |
| . . . | |
| Water leaks at windows: no flashing of nailing fins for windows or sliding doors; overdrive nails or missing nails w/o sealant; not meet UBC for weatherproofing | $1,564,193.00 |
| Missing sealant at exterior dissimilar materials: where wood trim and artificial stone meet; install new backer rod and sealant to close joint gaps | $56,842.00 |
| Flashing at artificial stone veneer: improper installation w/ reverse slope, open joints and poor integration w/ other materials; install new flashing over joints | $341,425.00 |
| . . . | |

| Descriptions | Palace Cost of Repair |
|---|---|
| Roofing – Field Shingles.  Repairs to include: missing shingles: due to wind from improper nailing; exposed nails at bottom edge of shingles; remove and replace shingles; nails outside mfg specs for nailing zone: where consistently outside zone, re-roof needed; replace shingles if less than 15% nailing outside zone; undriven nails backed out through shingles: R/R shingles where damage from backing out; missing plywood decking; sheet metal as substrate: gap in sheathing at bldg. 15 at eave location; R/R shingles; improperly aligned shingle rows: R/R misaligned shingles; exposed nails below shingle lap: R/R affected shingles; nails from underside of roof decking protruding through shingles: remove nails and R/R affected shingles and underlayment; toe board nails still in place: remove nails and R/R affected shingles; loss of granules across shingles: R/R affected shingles; plastic protection strip prevents proper shingle seal: remove plastic stip and hand seal shingles OR R/R unsealed shingles; inadequate offset at shingle end joints of adjacent courses: R/R underlayment and shingles with proper offset; holes in ride shingles: R/R shingles where holes occur; and valley framed as dead valley without slope: at Bldg. 55 only, reframe roof slopes and R/R shingles and underlayment. | $69,433.00 |
| Roofing – Eaves:  Repairs to include: improper starter shingle: omitted or laid improperly; install new starter shingle with sealant for proper lap with field; roof deck short of fascia (gap 1-2"); sheathing not extend to outside eave edge; install new sheathing; R/R shingles & underlayment; roof deck short of fascia (gap >2"): some gaps are so large you can see them from ground; sheet metal drip edge set on top of felt underlayment: R/R drip edge and install per mfg specs; drip edge metal backwards with edge under shingles: allows drawing of water up vertical leg of flashing; R/R drip edge and install per mfg specs; framing mismatch at corner: sheathing gaps and/or elevation changes; R/R framing, decking, and fascia for smooth roof plane transition; missing drip edge flashing at eaves: randomly installed & needed per UBC; where missing, R/R shingles & gutter & install drip edge; shingles overhang eave (>1 ½"): trim shingles in straight line to max ¾" past roof edge; poor workmanship at drip edge flashing: forced in place resulting in bent/mangled metal; R/R shingles and install new metal; shingles not extend past roof edge: less than ¼" from outside face of fascia; R/R shingles; drip edge nailed through shingles: not meet mfg. specs.; R/R drip edge; starter shingle extends past bottom row of shingles: trim starter and 1st course of shingles to max. ¾" past roof edge; and missing underlayment: install underlayment with new metal and shingles. | $461,476.00 |
| . . . | |

| Descriptions | Palace Cost of Repair |
|---|---|
| Roofing – Skylights. Repairs include: sheet metal flashing causes water to collect above skylight: install new flashing at top of curb extend 18" upslope & interlace w/ underlayment & shingles; top edge of step flashing not covered by skylight unit: need counterflashing at top edge of step flashing; surface attached sheet metal flashing: attached to skylight directly; remove light, seal holes and reinstall; replace if damaged; improper coverage at headwall/sidewall shingles: R/R shingles and add new flashing at top of curb; skylight unit too large for roof curb: at bldg. 5 only; R/R skylight; improper step flashing installation:  gaps between adjacent step flashing pieces; install proper sized flashing; no cricket at wide side of skylight (38" wide): need crickets at curbs over 24" wide; install at top side of curb w/ custom fit sheet metal saddle; skylight not fastened to curb: install screws at pre-drilled holes to attach unit to curb; damaged flashing at top of curb: at bldg. 26 only; reconstruct entire curb due to water damage; skylight installed too close to valley: at bldg. 71 only; blocks roof drainage; and reconstruct roof curb to provide 12" clearance from valley. | $13,492.00 |
| Roofing – Vents.  Repairs include: improper shingle overlap at roof jack flange: remove shingles at vent jack flange and install new properly course shingles; missing sealant at surface fasteners on downside of jack flange: apply sealant; improper clearance of adjacent vents: need min. 12" clear; remove shingles & relocate jack w/ new underlayment & shingles; improper coverage of vent jack flange: R/R shingles providing full jack coverage at top/sides; vent too close to valley: need min. 12"; relocate jack, reconstruct valley & jack flashing w/ new underlayment & shingles; surface nails used around vent: R/R shingles where surface nails used and install with concealed nails; over-cuts in shingles around attic vents: remove vent/shingles & install  new underlayment/shingles w/properly interlaced attic vent flange into shingles; and attic vent is loose and not nailed: R/R shingles and vent. | $30,822.00 |
| Roofing – Head Walls: Repairs include: incomplete coverage of apron flashing at headwall: gaps at headwall flashing with water intrusion; install additional headwall flashing to cover gaps; missing/insufficient nails at headwall flashing: install additional 2" nails to secure downslope of flange to roof surface; improper coverage of vertical leg of headwall flashing: flashing not covered by siding; install new siding for proper coverage; missing headwall flashing: R/R siding and install flashing: cut in headwall flashing at top of valley: install flashing to cover cut with sealant; and step shingles used as headwall flashing: install new flashing. | $15,661.00 |
| . . . | |

| Descriptions | Palace Cost of Repair |
|---|---|
| Civil and grading: general non-conformance w/lot grading template, including sidewalk construction; removal of flatwork, install concrete chase, concrete pan, etc. | $571,366.00 |
| . . . | |
| J.A. Cesare Foundation and Unit Concrete Repairs, concrete flatwork | $220,960.00 |
| . . . | |
| Furnace and water heater platforms | $50,346.00 |
| Squeaking floor repairs at 14 units | $8,104.00 |
| Second floor joist support at water heater (All 105 model units only) | $222,563.00 |
| Damaged roof trusses | $9,152.00 |
| Second floor cantilevers at rear of building | $328,612.00 |
| Front entry cover | $331,682.00 |
| Deck cover columns | $196,108.00 |
| . . . | |
| Structural truss Repairs:<br>- $3,125.00 per truss, multiplied by an estimate of 10 cut trusses per unit = $31,250.00 per unit<br>- 158 units to repair (213 units less 31 "carriage" units, less 24 units with work performed by CMI where no cut trusses observed) = $4,937,500.<br>- Estimated relocation costs of $1,500 per unit, multiplied by 158 units = $237,000.00 | $5,174,500.00 |

Id. at 500-05.

Adding to the absurdity of Marvi's efforts to convert on paper construction defects into damage caused by construction defects is his explanation, quoted below, of the largest item in the tables, the $5,174,500.00 item pertaining to defects in the trusses.

42

11.   Based on my personal knowledge and observations, the floor girder trusses were not designed properly to allow for HVAC venting to pass through them.  The floor trusses were also installed incorrectly, which did not allow for the installation of the main heating/air conditioning ducts.  Post-installation, the floor trusses' structural chords and webs were cut by a subcontractor to create a large enough opening to install the subject ducts. In my extensive experience with the homebuilding industry over 20 plus years, it is my opinion that the girder floor trusses or floor trusses on each affected unit were within a reasonable degree of engineering probability cut between the date of the rough framing inspections and the rough heating inspections. The dates of rough framing and rough heating inspections by the Douglas County Building Department, ranging from February 26, 1999 through June 14,2000, are listed on pages 89 through 110 of the defect summary matrix attached hereto in Exhibit 4. Further, based on my review of the subject trusses in my capacity as a repair consultant on the project and my general forensic engineering experience, there was actual physical injury to the trusses at the moment they were cut to accommodate for the HVAC venting. There was also continuing, progressive damage to trusses and resulting damage to other components over time resulting from these cuts.

12.   To determine liability in the *Carlyle Park* lawsuit for the cut floor trusses, the parties negotiated a cost-of-repair estimate for each cut floor truss and the experts performed destructive testing on a number of buildings to determine what percentage of floor trusses were cut.  By multiplying the cost-of repair number by the percentage of cut trusses, we assigned a dollar figure for the cut floor truss repairs in a single building.  We were aware at the time of settlement that 8 buildings would most likely not contain cut floor trusses because they were constructed by a compliant subcontractor.  Accordingly, only 63 buildings were encompassed with the scope of the cut floor truss component of the settlement.  We then multiplied the cost of repair number by the total number of involved buildings giving us the total value of the repair floor truss component of the *Carlyle Park*

settlement.  I have since overseen repairs to
approximately 20 buildings and determined that the
number of cut floor trusses in those buildings is
similar to the number we found in the sample buildings
we reviewed prior to the settlement.

13.  Of the 63 buildings with cut floor trusses, 46
buildings contained floor trusses that would have been
cut within the AGLIC Policy Period, or 73%.  The amount
of the settlement allocated to the truss repair
component was $5,174,500.00, not including pre-judgment
and post-judgment interest.  Accordingly, $3,777,385.00
($5,174,500.00 (total repair cost) x 73% =
$3,777,385.00) is attributable to repair of the trusses
that were cut within the AGLIC Policy Period.

Id. at 7-8.

No matter what spin Marvi puts on the facts stated in the

settlement documents, he continues, as disclosed by the quoted

language, to be unable to give a rational statement as to how the

cost of replacing defectively installed trusses can legally

become damage to other parts of the property caused by the

defective truss workmanship.

The quoted language related to the defective trusses

highlights another area of inadequacy in Marvi's presentation.

The court notes that his focus from a time standpoint is on when

the trusses were cut, i.e., when the defective construction work

occurred.  He explains "there was actual physical injury to the

trusses at the moment they were cut to accommodate for the HVAC."

Id. at 7.  Marvi then adds: "There was also continuing,

progressive damage to trusses and resulting damage to other

components over time resulting from these cuts," with no further explanation.  Id.  Marvi's attempt to conflate defective construction work with damage to other property caused by that defective work is legally unacceptable, and does not constitute probative summary judgment evidence on that subject.

The foregoing discussion related to the presentations made by Marvi as to the Carlyle Park Lawsuit apply as well to his presentations as to the St. Andrews and Sterling Commons Lawsuits.  His bald conclusory statements that "it is my opinion based on my review of the expert reports, my own observations, and other documents . . . that at numerous buildings damage occurred or continued to occur within the AGLIC Policy Period" (as to the St. Andrews project), id. at 11-12, and "it is my opinion based on my review of the expert reports, my own observations, and other documents . . . that the damage occurred or continued to occur at some buildings within the AGLIC Policy Period" (as to the Sterling Commons project), id. at 14-15, do not constitute probative summary judgment evidence.

Interestingly, Marvi does not include any recitations in his affidavit that would make his opinions admissible under the standards established by Rule 702 of the Federal Rules of Evidence.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  The

45

court is not persuaded that Marvi has the scientific, technical,
or other specialized knowledge that would help the trier of fact
to understand the facts related to the point in time when
property damage caused by defective construction occurred, nor
has Marvi provided in his affidavit information that would
persuade the court that his testimony is based on sufficient
facts or data and is the product of reliable principles and
methods.  <u>See</u> Fed. R. Evid. 702(a), (b) and (c).  The same
applies to all of the material that is marked as Exhibits 4, 5,
and 6 to Marvi's affidavit.  Pls.' Resp., App. at 79-299.  None
of those items satisfy the Rule 702 prerequisite to admissibility
as testimony by an expert witness.  The appearance is that Marvi
simply pulled principles and methods out of the air, without any
rational basis.  Perhaps more importantly, a careful study of the
material at App. 79-299 discloses that Marvi actually engaged in
exercises to the end of trying to pinpoint the dates when
defective construction occurred, and then pretends that those are
the dates when the defective construction caused property damage
to other property.[6]

---

[6]In addition to the shortcomings of the Marvi affidavit and its exhibits that are described above, the
court previously found many features of Marvi's affidavit and its attachments to be subject to defects that
would cause those parts not to be appropriate summary judgment evidence.  See May 11, 2012 order
granting defendant's objections to portions of evidence attached to Horton's response to defendant's
motion for partial summary judgment.

No rational finder of fact would accept Marvi's contentions relative to physical injury to other property resulting from the defective construction work; much less would a rational finder of fact find, based on Marvi's presentations, that physical damage to other property took place during the July 1, 1999 to July 1, 2000 policy year by reason of the defective construction work.

(3)   The Briggs Affidavit

The third affidavit is of Robert Briggs ("Briggs"), who identified himself as "a self-employed Claims Administrator working for various insurance carriers and their defendant/coverage counsel in handling construction defect litigation through mediations, site inspections, coverage hearings and trial throughout the western US." Id. at 556.  The point of his affidavit is to try to persuade that what he refers to as the "close of escrow date" is the date normally used "in negotiating construction defect cases with other carriers involving continuing or progressive losses over multiple policy years and involving multiple carriers . . . as the basis for the allocation of payments for property damage." Id. at 557, ¶ 7. He explains why the "close of escrow date" is used by saying:

> 8.   The insurance industry understands that without
> the use of close of escrow dates to determine the
> allocation of payment for property damage, the
> cost, time, and additional discovery that would be
> needed to establish the payment for property

47

> damage would be an unwarranted burden on the
> investigative process and the court system as a
> whole.  It would also create a system where
> settlement of construction defect cases would be
> difficult if not impossible.

Id. at 557-58.

The court is uncertain as to what Horton thinks it has

gained from the Briggs affidavit because it does not seem to be

applicable to the instant action, which does not involve a

negotiated settlement.[7]  A contention that "close of escrow

dates," rather than a date when actual property damage took

place, controls goes directly against principles stated by the

Texas Supreme Court in Don's Building Supply, Inc., supra at 28-

29.  As the Texas Supreme Court noted in that case, the court is

not authorized, merely because "[p]inpointing the moment of

injury retrospectively is sometimes difficult," to "exalt ease of

proof or administrative convenience over faithfulness to the

policy language."  Don's Bldg. Supply, Inc., 267 S.W.3d at 29.

By urging the court to adopt the "close of escrow date" method of

pinpointing when insured property damage took place, Horton, in

effect, is urging the court to revise the contract rather than to

review it and to adopt an approach as a matter of policy, not

---

[7]Defendant objected to the paragraphs in the Briggs affidavit in which Briggs discussed +the "close of escrow date" concept. Def.'s Objections to Portions of Evidence (Docket Entry 33) at 10-11. The court sustained those objections, and held that those portions of the affidavit are not appropriate summary judgment evidence. May 11, 2012, Order at 2.

law, thus dishonoring "the parties' chosen language-covering third-party claims if damage to the claimant's property occurred during the policy period." Id. at 29-30.

Moreover, the Briggs affidavit suggests that the "close of escrow date" allocation technique is used only if the case presents a claim for insured property damage "involving continuing or progressive losses over multiple policy years and involving multiple carriers." Pls.' Resp., App. at 557, ¶ 7. There is no summary judgment evidence that this is that kind of case, i.e., there is no evidence that there were continuing or progressive insured losses over multiple policy years. Indeed, there is no probative evidence that, or as to when, any insured property damage covered by any policy took place.

   4.   Interim Conclusion

For the reasons given above, Horton has not carried its summary judgment burden to adduce evidence of insurance coverage by showing that the claims against Horton as to the St. Andrews, Sterling Commons, and Carlyle Park Lawsuits were based on insured property damage that took place during the July 1, 1999 to July 1, 2000 policy year. That shortcoming on Horton's part is sufficient basis for granting defendant's motion for partial summary judgment as to Horton's breach of contract claims.

Moreover, relatedly, even if there were some evidence of insured property damage that took place during the July 1, 1999 to July 1, 2000 policy year, there is no probative summary judgment evidence that would enable the court to allocate, distinguish, or apportion that damage from the cost of correcting the defects in the construction work itself or the taking of preventive action to keep future damage from occurring.  Texas law supports the proposition that, in such an event, a take-nothing judgment is appropriate.  Supra at 31.

D.   The Lack of Pleading or Probative Evidence That the Limits of the Underlying Policies Have Been Exhausted by Payment of Claims Covered by Those Policies During the July 1, 1999 to July 1, 2000 Policy Year

   1.   Applicable Legal Principles

Bearing in mind the basic principles that Texas courts construe insurance policies according to the same rules of construction that apply to contracts generally, that unambiguous language in an insurance contract must be enforced as written, and that policy terms are to be given their ordinary and commonly understood meaning, supra at 12-13, the court is satisfied that in order to carry its burden under Texas law to establish a payment obligation under defendant's policy for any property damage that took place during the July 1, 1999 to July 1, 2000 policy year Horton had the burden to establish that the limits of

50

liability of the National and Admiral policies, as well as Horton's self-insured retentions,[8] had been exhausted by payment of claims covered by those policies during that policy year. <u>See Dresser Indus. v. Underwriters at Lloyd's, London</u>, 106 S.W.3d 767, 771 (Tex. App.--Texarkana 2003, pet. denied) ("[the insured] must prove the exhaustion of underlying insurance as a condition precedent to recovery against the excess carrier."). There is no other reasonable interpretation that can be given to the provision in defendant's policy that "[i]f other insurance applies to damages that are also covered by this policy, this policy will apply excess of the insurance." Mot., Br., App. at 208. Nor is there any other reasonable construction that can be placed on the policy language that imposes on defendant the obligation to pay on behalf of Horton the sums in excess of the coverage provided by National's policy that Horton becomes legally obligated to pay as damages under defendant's policy, <u>id.</u> at 204, or the language in defendant's policy that "if all Underlying Limits are exhausted," the "insurance provided by [the] policy . . . will apply as underlying insurance subject to

_____

[8]Of course, neither Admiral nor National had any payment obligation under its policy until Horton paid its self-insured retention for the applicable policy year on claims insured by the policy. As noted earlier, Horton's self-insured retention under Admiral's policy was $200,000 per occurrence and $2,500,000 aggregate. <u>Supra</u> at 10.

the same terms, conditions, definitions and exclusions of the [National] Policy," _id._

In the opinion of the Fifth Circuit in <u>Service Corp.</u> <u>International v. Great American Insurance Co. of New York</u>, 264 F. App'x 431, 2008 WL 280900 (5th Cir. 2008),[9] the Fifth Circuit held that for settlement payments made by an underlying carrier to apply toward exhaustion they must be made in settlement of claims covered by the underlying policies during the applicable policy year.  The Fifth Circuit explained that exhaustion, or excess, clauses such as those contained in defendant's policy

> show that Great American agreed to provide excess
> insurance over the amount SCI is entitled to collect
> from Chubb for losses—sums actually paid in settlement
> of claims.  The clauses consistently demonstrate that
> the parties intended loss and exhaustion to be measured
> by the sums used for payment _of claims,_ not simply by
> the sums paid.  The fundamental issue, then, is whether
> Chubb's payment of $25 million was paid in settlement
> or satisfaction of claims for the 2000-2001 policy
> year, thereby exhausting Chubb's coverage and
> triggering Great American's coverage.  _Cf. Fed. Ins._
> _Co. v. Srivastava,_ 2 F.3d 98, 102-03 (5th Cir. 1993)
> (noting that an excess insurer's coverage "begins when
> a loss exceeds the policy limits of all underlying
> policies . . . regardless of whether the underlying
> insurers actually pay those limits" and holding that an
> excess insurer had no liability when losses did not

---

[9]The court recognizes that the <u>Service Corporation International</u> opinion is not to be treated as precedent.  Nevertheless, the court finds explanations given, and holdings made, in the opinion instructive.

> reach its coverage layer even though underlying
> insurers were insolvent and could not pay).

264 F. App'x at 433-34, 2008 WL 280900, at *2.  And:

> Great American contemplated the risk that SCI would be
> subject to claims in excess of Chubb's policy limits.
> It did not contemplate that Chubb would pay its policy
> limits without regard to whether the payment would be
> used for covered claims.  We must be "careful not to
> shift contracted-for risks."  *Srivastava,* 2 F.3d at
> 102.

264 F. App'x at 434, 2008 WL 280900, at *3.  Importantly, the

Fifth Circuit added that "to be counted toward the $25 million

loss threshold needed to trigger Great American's excess policy

coverage, the loss must be attributable to the 2000-2001 policy

year."  Id.  And,

> The dispositive fact in this case is undisputed: only
> $13.75 million was ultimately paid to plaintiffs with
> covered claims arising within the 2000-2001 policy
> year.  Based on that fact, we conclude that Chubb's
> policy has not been exhausted in a way that triggers
> Great American's coverage.  SCI identifies no genuine
> disputed issues of fact that could change that
> conclusion.

264 F. App'x at 436, 2008 WL 280900, at *4.

    2.   Pleading Inadequacies as to Exhaustion

Another reason why Horton's complaint could not have

survived a motion to dismiss for failure to state a claim upon

which relief could be granted is that it has not satisfied the

pleading standards of Rule 8, Federal Rules of Civil Procedure as

to the exhaustion issues as the Supreme Court interpreted those

standards in <u>Twombly</u> and <u>Iqbal</u>.  Rule 8 requires that the
plaintiff do more than simply allege legal conclusions or recite
the elements of a cause of action.  <u>Twombly</u>, 550 U.S. at 555 &
n.3.  <u>See also</u>, <u>Kapps v. Torch Offshore, Inc.</u>, 379 F.3d 207, 210
(5th Cir. 2004) (stating that "mere conclusory allegations will
not suffice to prevent a motion to dismiss.").  Even though a
court must accept all of the factual allegations in the complaint
as true, a court need not credit bare legal conclusions that are
unsupported by any factual underpinnings.  <u>See</u> <u>Iqbal</u>, 556 U.S. at
679 ("While legal conclusions can provide the framework of a
complaint, they must be supported by factual allegations.").

      Horton's complaint on the subject of exhaustion does not
satisfy the Rule 8 requirement that the facts, rather than legal
conclusions, be pleaded.  The subject of "exhaustion" is
mentioned in only two places in Horton's pleading, first in
paragraph 26, the pertinent part of which reads in its entirety
as follows:

      26.  As a second-level excess insurer, American
      Guarantee's coverage obligations are triggered upon
      exhaustion of the applicable limits under both the
      Admiral Primary and National Union First-Level Excess
      Policies.  The products/completed operations limits
      under these Policies were, in fact, exhausted through
      payment of defense costs, settlements and judgments <u>on
      various claims over the years</u>.  D.R. Horton timely and
      appropriately notified American Guarantee of the

> exhaustion and tendered a number of claims for which
> coverage is afforded under the Policy.

Pls.' Original Pet. (Docket Entry 8) at 5, ¶ 26 (emphasis added).

The only other mention of exhaustion in the pleading is the

sentence in paragraph 27 saying, "[d]espite having received

adequate evidence of exhaustion of the underlying policies,

American Guarantee incorrectly contended otherwise in an attempt

to avoid payment of contractually-owed benefits." Id. at 7, ¶

27.

No factual allegations are made that would support the

conclusory allegations that the limits of the underlying policies

were exhausted.  There is no allegation that the limits of

insurance provided by the underlying policies were paid on or in

satisfaction of claims for which those policies provided coverage

for the policy year July 1, 1999-July 1, 2000.  Nor is there an

allegation that Horton's self-insured retention was paid on

claims of that kind.  For all one can tell from the conclusory

allegations of the pleading, Horton is contending that exhaustion

occurs as to the underlying policies even though Horton has not

paid its self-insured retention and even if the payments that led

to the claimed exhaustion were arbitrarily made without regard to

the coverage provided by the underlying policies or the coverage

year in which the payments properly could be assigned for

exhaustion purposes.   Indeed, the allegations imply otherwise, by saying that the exhaustion occurred "through payment of defense costs, settlements and judgments on various claims over the years."   Id. at 5, ¶ 26.

     3.   Absence of Probative Evidence

The summary judgment evidence tendered by Horton on the exhaustion evidence is in the form of the Morice affidavit and exhibits attached to it.   Defendant objected to that purported evidence.   Def.'s Objections to Portions of Evidence (Docket Entry 33) at 6-9.   The court sustained those objections, and held that those portions of the affidavit and its attachments are not appropriate summary judgment evidence.   May 11, 2012 Order at 2. Thus, Horton is without any probative summary judgment evidence in support of the exhaustion element of Horton's burden to prove a payment obligation on the part of defendant.

Furthermore, even if the items that were stricken were to be treated as summary judgment evidence, Horton would be no better off because all of those items are conclusory only, without any evidentiary support in facts that would lead to the conclusion that any such exhaustion occurred by reason of claims for which insurance coverage was provided by the underlying policies for the July 1, 1999 to July 1, 2000 policy year.

4.   Interim Conclusion

For the reasons given above, Horton has not carried its summary judgment burden to adduce probative evidence that defendant had a payment obligation under defendant's policy by adducing evidence that the limits of the underlying policies, as well as Horton's self-retention, were paid on or in satisfaction of claims for which those policies provided liability insurance coverage for the July 1, 1999 to July 1, 2000 policy year.  That shortcoming on Horton's part is another sufficient basis for granting defendant's motion for partial summary judgment as to Horton's breach of contract claims.

E.   Conclusion

The court concludes, for the reasons stated in the memorandum opinion, that Horton has not satisfied its evidentiary burdens to raise an issue that defendant had a payment obligation to Horton under defendant's policy.  Consequently, defendant's motion for partial summary judgment as to Horton's breach of contract claims must be granted.

V.

Order

Therefore,

The court hereby ORDERS that defendant's motion for partial summary judgment be, and is hereby, granted, and that Horton's breach of contract claims against defendant be, and are hereby, dismissed with prejudice.

SIGNED May 22, 2012.

_____
JOHN McBRYDE
United States District Judge